IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

No. C-05-01785 NJV

MANDI HAYDEN,

Plaintiff,

v.

REDWOODS COMMUNITY COLLEGE DISTRICT, dba COLLEGE OF THE REDWOODS, and DOES ONE to FIFTY, inclusive,

Defendants.

_____/

AMENDED ORDER DENYING THE PARTIES MOTIONS FOR SUMMARY JUDGMENT AND FOR INJUNCTIVE RELIEF

In this action for discrimination by denying meaningful access to a public accommodation in violation of Title II of the Americans with Disabilities Act of 1990 (ADA), section 50 of the Rehabilitation Act, and the Unruth Civil Rights Act [Cal. Civil Code sections 51, 51.5, 52(A), 52.1, 54, 54.1, 54.3, and 55], brought by Plaintiff Mandi Hayden against Defendants Redwoods Community College District et al., both parties have filed motions for summary judgement in whole, or in the alternative, in part.  For the reasons set forth below, the parties motions are denied.

**I.  BACKGROUND**

Plaintiff Mandi Hayden attended the College of the Redwoods ("the College") between Spring of 2003 and Fall of 2005.  (Joint Statement of Stipulated Facts in Support for Mot. for Summ. J. #5.)  The College is part of the Redwoods Community College District, which is part of the California Community College system, and is a state agency subject to Title II of the ADA.   (Stipulated Facts #1.)  A violation of the ADA is, per se, a violation of the Unruth Act.  (Lentini v. Cal. Center for the Arts, 370 F.3d 837, 847 (9th Cir. 2004).)  The Redwoods Community College District is also a recipient of federal funds and is therefore subject to section 504 of the Rehabilitation Act.

(Stipulated Facts #1.)

Plaintiff was born with the inability to hear and is completely deaf. (Stipulated Facts #3.) Plaintiff attended a deaf program from preschool through grade 6 at Magnalia Elementary School in Carlsbad, California from teachers who signed, and then grades 7 through 12 at the School for the Deaf in Riverside, California, also taught by teachers who signed. Thus, Plaintiff received her early education in American Sign Language (ASL), which is also her first language. ASL is not a visual representation of English or any other spoken language, but an entirely distinct visual language.

In the Spring of 2003, Plaintiff enrolled at College of the Redwoods. At the College, the Disabled Student Programs and Services (DSPS) is responsible for the provision of auxiliary aids. (Stipulated Facts #7.) While Plaintiff was enrolled at the College, Tracey Thomas was the Director of DSPS. (Stipulated Facts #8.) The State Chancellor's Office oversees the College and has issued guidelines that 5% of the College budget must be kept in reserve, leaving 95% to be allocated. (Stipulated Facts #74-75.) The annual budget of the College, from which DSPS's budget comes, is based on the number of students enrolled. (Stipulated Facts #73.)

The annual budget of DSPS is determined by a set formula based on the number of students who receive disabled student services from the College. (Stipulated Facts #71.) The annual budget of DSPS in 2000-2001 was $1,213,662.57, $1,361,630.20 in 2001-2002, $1,288,247.45 in 2002-2003, $1,314,464.45 in 2003-2004, and $1,367,093.95 in 2004-2005. (Stipulated Facts #72.) DSPS served 1,316 students in 2000-2001, 1,227 in 2001-2002, 1,401 in 2002-2003, 1,247 in 2003-2004, and 1,199 in 2004-2005. (Stipulated Facts #9.) In terms of students receiving interpreter services from DSPS, 3 students in 2001-2002, 4 in 2002-2003, 6 in 2003-2004, 8 in 2004-2005, and 8 in 2005-2006. (Stipulated Facts #10.)

On November 2, 2002, Plaintiff applied for DSPS services. (Stipulated Facts #11.) In order to receive services, students must agree to abide by policies and procedures designed to "maximize administrative efficiency when providing DSPS services." (Stipulated Facts #15.) On November 6, 2002, Plaintiff applied specifically for Interpreter Services. (Stipulated Facts #13.) That application process included signing a document entitled "DSPS Guidelines for Interpreter Services"

that outlined the College's policies for interpreter requests, absences, and the appeals process for grievances. (Stipulated Facts #13.) Plaintiff signed this document. (Stipulated Facts #13.) Plaintiff never told anyone at DSPS if she understood the document. (Stipulated Facts #20, #4 of D's.) Nor does it appear if anyone from the College asked her if she understood it.

Among the provisions of the Interpreter Guidelines were those regarding absences. In relevant part the guidelines stated that "if you plan to miss one or more classes, please notify DSPS at least 24 hours before the missed class(es). If the office is closed, please leave a message. This will allow DSPS to promptly inform your interpreter and make any needed changes to the interpreting schedule. If you are ill or if an emergency situations arises please contact DSPS within 24 hours. [sic] If you do not show up for a class and DSPS has not been notified, the absence will be considered unexcused. If there are three or more unexcused absences, or other such situations occur that are perceived by DSPS as abusing the interpreting services, DSPS will suspend your interpreting services. In order to clear an unexcused absence, please bring a doctor's note, etc., to the DSPS office. If you would like your services reinstated, you will need to make an appointment with DSPS."

Also included in the guidelines is a section named "Appeals Process." In that section, the policy states that "if you have a concern about academic programs or college services, and feel you have been denied services or access to a program, we encourage you to meet with the appropriate program or department manager. If you cannot resolve the issue, please contact the Vice President of Student Services."

On November 15, 2002, Plaintiff submitted medical documentation that she is a deaf individual with "severe-to-profound sensorineural hearing loss bilaterally" with "limited hearing even using hearing aids" and lip reading skills that allow for "50% understanding." (Stipulated Facts #14.) The form indicated a "possible benefit from interpreter (sign language) and notetaker." (Stipulated Facts #14.) Plaintiff received a copy of the DSPS Student Resource Guide, which outlined the services available to disabled students, the procedure to obtain such services, and the procedure for grievances. (Stipulated Facts #18.) All of the text in the Guide consists of a bold topic heading, followed by single-spaced paragraphs of a few sentences each. None of the text in the Guide is in

3

fine print.

The Student Resource Guide contains several sections relevant to the motions at hand. Under 'Sign Language Interpreters,' the Guide notes, "<u>An Interpreter will be provided through the DSPS office for students who are deaf or hard of hearing and who wish to use sign language as their primary and preferred mode of communication.</u>" When a student completes an application for such services, "<u>DSPS will then recruit qualified Interpreters for the classes the student will be attending.</u>" [emphasis added].

A later section of the Guide notes the 'Grievance Process.' There, the Guide states that "Every effort will be made to resolve the matter through the informal process. This may include a meeting with the Coordinator at DSPS, the faculty member and the student to determine a reasonable accommodation or service for the student. In situations when an agreement can not be reached informally, the Academic Accommodations panel will review the grievance. . . The student still has the right of external appeal to the Office of Civil Rights under Section 504 of the Rehabilitation Act of 1973." This final sentence regarding the Rehabilitation Act of 1973 is its own paragraph.

Over the course of the next seven semesters, Plaintiff received Interpreter Services from DSPS from seven different interpreters. Prior to the start of each semester, DSPS would send Plaintiff a letter with the Interpreter assignments, and attach a copy of the Guidelines for Interpreter Services that Plaintiff signed on November 6, 2002. Plaintiff consistently refused real-time captioning and transcription services, though DSPS offered them to her several times. Instead, Plaintiff exclusively prefered Interpreters as her auxiliary aids. Most classes only require a single Interpreter. For particularly long classes, teams of two may be assigned so that one person is not signing for several hours, which can become painful for the Interpreter's hands. Instead, the Interpreters alternate, giving the other a chance to rest.

In the Spring semester of 2003, starting on January 27 of that year, Plaintiff was assigned as Interpreters Lyssa Elder for four classes (BUS11, CIS80, CIS81, BUS1505) and Julie Warren for three classes (CIS1, CIS1L, and PE12). In addition, Julie and Lyssa interpreted on alternate days for another class (ART10). DSPS assigned an interpreter for all of Plaintiff's classes. After Plaintiff

4

complained on April 2, 2003 about Julie's interpreting skills to DSPS, DSPS assigned Lyssa to Interpret Plaintiff's CIS1 and CIS1L. Julie remained a part-time interpreter for Plaintiff's ART10, and the sole interpreter for Plaintiff's PE12. Plaintiff earned a 3.586 g.p.a. in this semester and believes that she would have done better in ART10 had she had a better interpreter than Julie. Plaintiff found Lyssa to be a qualified Interpreter and never complained about her. (Stipulated Facts #21-22.)

For the Fall Semester of 2003, beginning August 25, 2003, DSPS assigned Lyssa to Plaintiff's entire schedule, eight classes in all (DM10, DM10L, SPCH1, ENGL150L, ART17, ENGL150, GUID345, and GUID205). Originally, Plaintiff had signed up for DM15, but after the semester started, she dropped DM15 and added GUID345, which she had not originally signed up for. Plaintiff also changed her scheduled lab times for ENG150L and DM10L. On September 17, 2003, DSPS scheduled Lyssa to provide Interpreter services for GUID345, and the changed lab times. Plaintiff earned a 2.6 g.p.a. in this semester, largely because of a D in ENGL150: College Reading and Writing. Plaintiff attributes this grade solely to her own scholastic abilities, not to Lyssa's Interpreting. Plaintiff has no complaints about DSPS services in Fall 2003.

Spring Semester 2004 began on January 26, 2004. The parties agree that Plaintiff was provided with qualified Interpreters during this semester. (Stipulated Facts #26.) Plaintiff received Interpreter services for all six of her classes. Lyssa provided Interpreting for JOURN5, ASTRO10, DM11, DM11L, and MATH376, while Dallass Kenworthy (nee Downy) provided Interpreting for PE17. Shortly after the semester began, DSPS assigned Dallass to team with Lyssa on JOURN5 and MATH376, as the classes were too long for one interpreter. Plaintiff earned a 2.077 g.p.a. in Spring 2004. She received an F in ASTRO10 and a D in MATH376. Plaintiff attributes these grades to her own scholastic abilities and health challenges, not to the Interpreting services that she received from Lyssa and Dallass. Plaintiff never complained and has no complaints about Dallass' Interpreting skills. (Stipulated Facts #24-25.)

In Summer semester 2004, which began on June 7, 2004, Plaintiff enrolled in one class: DT24. DSPS assigned Dallass to Interpret this class for Plaintiff. Dallass' hands hurt because of the long duration of the class, but Plaintiff did not receive an additional interpreter. Instead, Dallass

5

interpreted the entire class on her own. She took rest breaks periodically, and would then attempt to summarize for Plaintiff what the Professor said during Dallass' break. After class, Dallass and Plaintiff would approach the Professor to discuss the class and ensure that Plaintiff did not miss anything. Plaintiff earned a 3.3 g.p.a. in this semester. The parties agree that Dallass was qualified. (Stipulated Facts #30.)

For Fall semester 2004, beginning on August 23, 2004, DSPS assigned Interpreters for all seven of Plaintiff's classes. Plaintiff had indicated to DSPS that she may not be attending the College in the Fall, but confirmed her attendance a few weeks before the semester started. Lyssa was no longer available by this time, as she had moved away[1]. Instead, DSPS assigned Dallass to five of Plaintiff's classes (BUS63, DM22, DM22L, DM15, and BUS63L). Additionally, Dallass interpreted MATH105 on two of the three days the class met each week, the other day was interpreted by Melody Poff. Tina interpreted Plaintiff's seventh class, CIS78. Plaintiff asked DSPS why Tina was assigned to her class, as she found her Interpreting unsatisfactory since Tina did not sign ASL. DSPS informed Plaintiff that no other interpreters were available, so Plaintiff dropped the class. Plaintiff later dropped DM15 due to reasons outside DSPS.

Plaintiff dropped BUS63L and BUS63 within the first two weeks because an Interpreter was unavailable after the class was rescheduled. Plaintiff did not want Melody Poff to interpret any of her classes, as Plaintiff did not believe Melody could sign ASL. On August 24, 2004, DSPS notified Plaintiff that due to "unforeseen circumstances" (Melody was injured), MATH105 on Fridays would have a substitute interpreter for Melody for "at least" the first six weeks of class. Dallass would substitute for the first two weeks, and then Lydia New for the remaining two weeks. Plaintiff told DSPS that she did not want Lydia interpreting any of her classes, but DSPS informed Plaintiff that no other interpreters were available. Dallass interpreted for the first two weeks as planned, but then Lydia was late to the third class. Plaintiff waited 5 minutes for Lydia, and then left. Plaintiff withdrew from all her classes a short time later on September 26, 2004, within the fourth week of classes, due to a work injury. Her decision to withdraw had nothing to do with DSPS. (Stipulated

---

[1] Plaintiff claims that Lyssa's hours had been cut in Spring 2004 by the College in order to offer sufficient hours to retain another Interpreter part-time. Plaintiff claims Lyssa was dissatisfied with her reduced hours and moved to New Mexico, where she now interprets for college students in the area.

6

Facts #32.)

In Spring 2005, beginning January 24, 2006, Plaintiff enrolled in seven classes. Since Lyssa had moved away, and Dallass was now on a reduced schedule because of pregnancy, Plaintiff was concerned about Interpreter availability. Plaintiff introduced DSPS to Christopher Gardner, an Interpreter Plaintiff met at Deaf Counseling, Advocacy, and Referral Agency (DCARA) who had recently moved to the Eureka area. (Stipulated Fact #33.) Plaintiff states that she only introduced DSPS to him and requested Christopher for some of her classes and Sandra for some, while Defendants hold that Plaintiff requested Christopher for all of her Spring classes. Either way, it was ultimately the decision of DSPS to assign Christopher to all seven of Plaintiff's classes (DM15, DT80, DM75A, DM75B, DM72, DM15, and DM77) in December of 2004. Later that month, Plaintiff requested Sandra Factor for DM75A, DM75B, DM72, and DM77 instead of Christopher because she did not feel Christopher could handle her engineering coursework. This caused Plaintiff to rely on Sandra, even though Sandra used English signs and not ASL. DSPS made the assignment changes as Plaintiff requested, leaving Christopher with DM15, DM80, and DM25. The parties agree Sandra was a qualified Interpreter; Plaintiff never complained about her. (Stipulated Facts #35-36.)

On February 4, 2005, after the semester had started, Plaintiff complained to Tracey about Christopher's professionalism and technical abilities, and requested that he no longer Interpret for her. (Stipulated Facts #38-39.) Plaintiff refused Tracey's suggestion of discussing Plaintiff's concerns with Christopher. (Stipulated Facts #40.) DSPS removed Christopher from Plaintiff's classes. DSPS offered real time captioning and transcription services instead, but Plaintiff refused. (Stipulated Facts #44-45.) Though Plaintiff requested them, neither Sandra nor Dallas were available at the time to pick up the classes that Christopher had been Interpreting for Plaintiff. DSPS assigned notetakers for these three classes and said they would work on finding another interpreter. Tracey promised to try to find a replacement, but explained that since the semester had already started, Interpreters had already been assigned to classes for other students. (Stipulated Facts #43.)

The following week in February, Plaintiff complained to DSPS that Christopher had sexually harassed her. DSPS referred Plaintiff to the College's Human Resources department to file a

7

1 complaint. (Stipulated Facts #55.) DSPS also directed Plaintiff to the policies and procedures in the
2 Course Catalog. (Stipulated Facts #56.) Plaintiff had no Interpreter for 1-2 weeks for those classes.
3 No replacement interpreters were ever assigned for DT25 or DM15. (Stipulated Facts #54.) On
4 February 28, 2005, DSPS assigned Dallass to Interpret for Plaintiff in her DM15 class. Plaintiff later
5 dropped DM15, because she had spent weeks without interpreters and was now too far behind.
6 She also dropped DT80, and DT25 because she felt it was too far to drive without being sure of
7 having an interpreter.

8     In mid-February 2005, DSPS attempted to find Interpreters for Plaintiff. Tracey contacted five
9 colleges and agencies for help in finding an interpreter for Plaintiff's three uncovered classes.
10 (Stipulated Facts #47-51.) On February 15, 2005, Cherry Hess of DCARA indicated to Tracey that
11 she had suggested a Video Interpreter (VI) to Plaintiff when Plaintiff had come into the Agency the
12 previous week, but Plaintiff was "not sure" about it. Cherry also indicated that Xenia, a certified
13 interpreter, would be moving to the Eureka area in the summer. Tracey contacted Xenia and
14 successfully recruited her as an Interpreter for the College, though Xenia would not be able to start
15 until the Fall sememster. Tracey also looked into the feasibility of VI, the costs of new equipment it
16 would require, and estimates from the College's tech support team. (Stipulated Facts #52.) As VI
17 uses a very large amount of internet connection bandwidth, the tech support team estimated costs at
18 $50-60k to upgrade the entire networking infrastructure to handle VI, or $5-10k per classroom to get
19 a faster T1 connection, with an additional $300-$400 per month in fees.

20     Plaintiff received a letter from Tracey on April 1, 2006 indicating that Plaintiff was close to
21 violating the terms of her Guidelines for Interpreter Services. (Stipulated Facts #79.) DSPS stated
22 that Plaintiff had two unexcused absences for the DM15 class (interpreted by Dallass since February
23 28, 2005), as Plaintiff had not notified the DSPS office within 24 hours of missing the DM15 classes
24 with an excuse. According to DSPS, Plaintiff called at 12:30pm on March 2, 2005 to indicate that
25 she would not be attending the March 2, 2005 DM15 class that began at 12:30pm. She also did not
26 attend the March 30, 2005 class. Consequently, Tracey sent the letter "as notification that if you miss
27 one more class without notifying us in the appropriate amount of time (24 hours), your interpreting
28 services may be suspended for the DM15 course." Plaintiff did not have a third unexcused absence,

8

as she withdrew from DT25, DT80, and DM15. She earned a 4.0 in her remaining four classes, all interpreted by Sandra, in Spring 2005.

In the Fall of 2005, Plaintiff was assigned Xenia for all two of her classes (DT80 and ENGR23). Xenia needed a back up interpreter for each of these classes, as they were over three hours each, but did not receive any help.. (Stipulated Facts #59.) Instead, Xenia would rest at times, and the Professors would take a break. The parties agree that Plaintiff did not miss any instruction because of these breaks. (Stipulated Facts #59.) Though her transcript reflects Fs in each of these classes, Plaintiff states that she withdrew in October of 2005 from school due to personal reasons. (Stipulated Facts #60.) She does not attribute her withdrawal to DSPS. (Stipulated Facts #61.)

Plaintiff feels that certified Interpreters are the only satisfactory auxiliary aid for her, though she sees no difference between 'certified' and 'qualified.' (Stipulated Facts #69.) DSPS offered her tape recording of a class in Spring of 2003, her first semester. Plaintiff used this service once, but it was too difficult for the Interpreter (Lyssa) to sign the lecture to Plaintiff without the Interpreter also seeing the lecture. Plaintiff was also unable to ask questions in class with this method. Transcriptions were also offered by DSPS, but Plaintiff declined, as she did not want to sit through a lecture without being able to comprehend it and then have pages of lecture in English to read later. DSPS offered real time captioning beginning in the Spring of 2004, but that would require Plaintiff to read English faster than she feels she is capable so she declined. As noted above, the College found VI to be an expensive proposition. However, Plaintiff is wary of VI as well, since it is harder to see the three-dimensional space that is important for expression in ASL on a two-dimensional television screen.

On February 10, 2006, the College approved the installation of VI on all its campuses. (Stipulated Facts #67.) The College has also regularly advertised for Interpreters in local newspapers both in and out of the Eureka area, as well as on its website since September 2003 and nationwide through Higher Education Jobs at www.higheredjobs.com and the Registry of Interpreters for the Deaf at www.rid.org. (Stipulated Facts #63-67.) The College also now offers classes in Interpreter skills, taught by Xenia. (Stipulated Facts #68.)

1    Plaintiff received Interpreting services for 91.5% of her classes (580/637) from Spring 2003
2 through Spring 2005, which does not include class meetings after Plaintiff dropped her classes in Fall
3 2004 and Spring 2005. (Stipulated Facts #77.) Between Spring 2003 and Summer 2004, Plaintiff
4 received an interpreter for 96.5% of her classes (491/509). (Stipulated Facts #76.) A full-time
5 permanent sign language interpreter is estimated to cost $85,244.01, with a base yearly salary of
6 $60,008.00 and benefits totaling $25,236.01.

**II.   DISCUSSION**

   **A. Summary Judgment Standard**

   Rule 56(c) of the Federal Rule of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. See id. The court may not weigh the evidence. See id. at 255. Rather, the nonmoving party's evidence must be believed and "all justifiable inferences must be drawn in [the nonmovant's] favor." United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989) (en banc) (citing Liberty Lobby, 477 U.S. at 255).

   The moving party bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, interrogatory answers, admissions and affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the nonmoving party will bear the burden of proof at trial, the moving party's burden is discharged when it shows the court that there is an absence of evidence to support the nonmoving party's case. See id. at 325.

   A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of [that] party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Liberty Lobby, 477 U.S. at 250. The opposing party, however, need not produce evidence in a form that would be admissible at trial in

10

order to avoid a summary judgment.  See Celotex, 477 U.S. at 324.  Nor must the opposing party show that the issue will be resolved conclusively in its favor.  See Liberty Lobby, 477 U.S. at 248-49. All that is necessary is sufficient evidence supporting the asserted factual dispute and requiring a jury or judge to resolve the parties' differing versions of the truth at trial.  See id.

**B. Plaintiff's Motion**

I. Plaintiff claims Defendant has discriminated by requiring Plaintiff to sign away her "rights" in order to receive services

II. Plaintiff claims Defendant is attempting to screen Plaintiff from services by use of its DSPS agreement and its policy and procedures in violation of 28 C.F.R. § 35.130(b)(f)

III. Plaintiff claims Defendant has failed to meet its burden regarding fundamental alteration or undue financial or administrative burden

IV. Plaintiff claims Defendant should be prohibited from continuing its discriminatory behavior

**C. Defendant's Motion**

I. Defendant claims no duty to provide a sign language interpreter

II. Defendant claims Plaintiff cannot show that the accommodations offered by the College were unreasonable.

III. Defendant claims Plaintiff cannot establish a *prima facie* case for an ADA violation

IV. Defendant claims Plaintiff should be estopped from asserting an ADA violation for the Spring 2005 semester

V. Defendant claims compensatory damages are not available because the College did not act with deliberate indifference to Plaintiff's requests

VI. Defendant claims Plaintiff's request for injunctive relief are moot and should be dismissed

**D. Analysis**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).

In ADA cases it is important to remember that "Congress enacted the ADA in 1990 to remedy

widespread discrimination against disabled individuals." PGA Tour, Inc. V. Martin, 532 U.S. 661, 674, 149 L. Ed. 2d 904, 121 S. Ct. 1879 (2001). The Act responds to what Congress described as a "compelling need" for a "clear and comprehensive national mandate" to eliminate discrimination against disabled individuals. "To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II) and public accommodations (Title III)."

In this case Defendant must provide Plaintiff with "meaningful access" to its programs. Hunsaker v. Contra Costa County, 149 F.3d 1041, 1043 (9th Cir. 1998). To that end, it may be required to make reasonable, but not fundamental or substantial, modifications to its programs See Alexander v. Choate, 469 U.S. 287, 300, 83 L. Ed 2d 661, 105 S. Ct. 712 (1985). Reasonableness requires a "fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards." Vinson v. Thomas 288 F.3d 1145, 1154 (9th Cir. 2002).

28 CFR § 160 requires public entities to "take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others." 28 CFR § 160(a). These appropriate steps include furnishing "appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity. In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities." 28 CFR § 160(b)(1)-(2).

In relevant part, the Appendix to Title II of the ADA provides: "the public entity must provide an opportunity for individuals with disabilities to request the auxiliary aids and services of their choice. This expressed choice shall be given primary consideration by the public entity (§ 35.160(b)(2)). The public entity shall honor the choice unless it can demonstrate that another effective means of communication exists or that use of the means chosen would not be required under § 35.164 [the affirmative defenses]. Deference to the request of the individual with a disability is desirable because of the range of disabilities, the variety of auxiliary aids and services, and different

12

circumstances requiring effective communication." 28 C.F.R. Pt. 35, App. A

Among the auxiliary aids listed by the statute for individuals with hearing disabilities are "qualified interpreters, notetakers, transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments." 28 C.F.R. § 35.104(1).

Defendant correctly acknowledges its duty under the ADA to make reasonable modifications to accommodate disabled individuals. However, Defendant argues that interpreter services– Plaintiff's preferred auxiliary aid– are not the only effective auxiliary aid, and that Defendant has the discretion to offer other aids. It is true that Defendant is not necessarily required to provide Plaintiff with her preferred auxiliary aid, but in giving her request primary consideration, Defendant may refuse her request only in limited circumstances, i.e. if there are other equally effective means of communication, or Defendant has an affirmative defense..

Defendant does not dispute it is a public entity subject to the ADA, and that it must "furnish appropriate auxiliary aids" where necessary to afford Plaintiff an equal opportunity to participate in the College. (Joint Stipulated Facts 1.) Nor does Defendant dispute that it must give "primary consideration" to Plaintiff's requested auxiliary aid, which Defendant acknowledges to be a ASL interpreter.

Where the parties differ is whether "another equally effective means of communication exists" as a form of auxiliary aid that affords Plaintiff an equal opportunity to participate in the College's programs besides an SLI. Defendant offered other auxiliary aids including transcription, real-time captioning, and audiotaping services to Plaintiff, all of which are listed by the statute as auxiliary aids for individuals with hearing disabilities. While it is true that Plaintiff rejected these options without trying them, it is Defendant's burden under the statute to demonstrate the proffered aid's effectiveness.

Though Plaintiff's application indicated her to have "50% lip reading ability" and possibly benefit from notetakers as well as SLIs, that does not necessarily mean that auxiliary aids that

13

1  complement these abilities are sufficient to satisfy the ADA's "equally effective communication"
2  standard. It is not clear from the record sufficient to satisfy the summary judgment standard whether
3  the auxiliary aids offered by Defendant in alternative to an SLI are sufficiently "equally effective" to
4  satisfy the ADA. Not only does the efficacy of an auxiliary aid vary with the hearing abilities of each
5  individual, but an auxiliary aid that provides Plaintiff with an equal opportunity to participate in one
6  particular class may not be sufficient in another class. Such findings cannot be made here.

7  It is for the trier of fact to determine whether the auxiliary aids offered by Defendant to Plaintiff
8  meet the standards created in the ADA.

9  The Supreme Court has noted that "the "undue hardship" inquiry requires not simply an
10 assessment of the cost of the accommodation in relation to the recipient's overall budget, but a
11 "case-by-case analysis weighing factors that include: (1) the overall size of the recipient's program
12 with respect to number of employees, number and type of facilities, and size of budget; (2) the type of
13 the recipient's operation, including the composition and structure of the recipient's workforce; and (3)
14 the nature and cost of the accommodation needed."" (Olmstead v. L. C. by Zimring, 527 U.S. 581,
15 606 (1999) citing 28 CFR § 42.511(c) (1998).)   Further, "if applicable, the overall financial
16 resources of the parent corporation and the number of facilities; and if applicable, the type of
17 operation of the parent corporation" are to be considered. 28 C.F.R § 36.104.

18 DSPS has 36 staff who served 1,199 students across 3 campuses in the 2004-2005 school year
19 with a budget of $1,233,172. (#55, 19:9; Joint Stipulated Facts #3, 71, 72.) The staff include not
20 only employees who assist hearing impaired students, but those who assist students with mobility
21 disabilities, learning disabilities, and other challenges, as well as administrative staff. (#55, 19:10.)
22 The budget comes from the California legislature and is dependent upon the number of disabled
23 students enrolled at the College, as well as the type(s) of disability (or disabilities) they have. (#55,
24 19:18-19.)

25 Defendant cites Roberts v. KinderCare Learning Ctrs., Inc., 86 F.3d 844 (8th Cir. 1996) an 8th
26 Circuit decision, to support its contention that the budget of the College should not be taken into
27 account, since financial operation of DSPS is separate. In KinderCare, the particular center was
28 responsible for being independently profitable and could not rely on the parent corporation's

14

resources. Here, however, DSPS is not intended to be a profitable operation, though it is responsible for managing its budget.

Defendant has provided the Court with financial information indicating that Plaintiff's demand for a personal interpreter would constitute nearly 7% of the DSPS annual budget. Personal interpreters for each of the 8 deaf students would constitute nearly 50% of the DSPS annual budget. With these figures, Defendant claims an undue financial hardship to accommodate Plaintiff's demand of a personal interpreter.

Again, it is for the trier of fact to determine whether or not this constitutes an "undue hardship" on the Defendant.

Regarding the remaining issues that the parties raise in their respective motions for summary judgment, the court comes to a similar conclusion. That is without "weighing the evidence" there remain genuine issues of material fact that must be decided by a jury. The core issue in this litigation appears to the court to be whether the College complied with its obligations under the ADA to provide adequate interpretation services to a hearing-impaired student that has been characterized by the Defendant as difficult and demanding. Plaintiff submits a very different picture of what took place over several semesters at the College. Plaintiff's version of events paints a picture of bureaucratic incompetence on the part of the Disabled Student Programs and Services Department of the College of the Redwoods and an attempt on their part to supply her with substandard assistance for her hearing disability. This analysis is by its nature fact driven.

## III.  INJUNCTIVE RELIEF

The bases for injunctive relief are irreparable injury and inadequacy of legal remedies. A party seeking a preliminary injunction must show either:

> (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips in its favor. These two formulations represent two pints on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.

Roe v. Anderson 134 F.3d 1400, 1402 (9th Cir. 1998) (citation omitted.) "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief . . ." Amoco Prod. Co. V. Village of Gambell, 480 U.S. 531, 542

15

1  (1987). The standard for a permanent injunction is essentially the same, except that the plaintiff must
2  show actual success on the merits. Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 546
3  n. 12 (1987). A "serious question" is one as to which the moving party has "a fair chance of success
4  on the merits." Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1421 (9th Cir. 1984);
5  see also Martin v. Int'l Olympic Comm., 740 F.2d 670, 674-75 (9th Cir. 1984) ("fair chance of
6  success"on the merits is an "irreducible minimum".)

> To obtain a preliminary injunction, the moving party must show either:
> (1) a combination of probable success on the merits and the possibility of irreparable injury without the injunction; or (2) that serious questions are raised and that the balance of hardships tips sharply in the moving party's favor.

Stuhlberg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839-40 (9th cir. 2001); Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc. 109 F.3d 1394, 1403 (9th Cir. 1997). These are not two separate tests, but are "outer reaches of a single continuum.'" Stuhlberg, 240 F.3d at 840 (quoting International Jensen, Inc. v. Metrosound U.S.A., 4 F.3d 819, 822 (9th Cir. 1993)).

The court is in receipt of the Defendant's supplemental letter brief dated 8/30/06. Plaintiff has not responded to the contents of that letter brief. The letter states, in part, that Plaintiff did not enroll for classes at the College of the Redwoods for the fall semester 2006. Based on these incontraverted facts, Plaintiff has failed to demonstrate "the possibility of irreparable" injury to her if a preliminary injunction were not granted at this time. Therefore, Plaintiff's request for a preliminary injunction is DENIED.

## IV. DEFENDANT'S CLAIM OF UNDUE ADMINISTRATIVE BURDEN

Defendant asserts an undue administrative burden in allowing Plaintiff to choose her own interpreter. (#55, 11:4-6.) Defendant states that Plaintiff cannot claim an ADA violation "by simply asserting that the full-time interpreter could not communicate effectively for her." (#55, 11:3-4.) If she could, Defendant argues, the College would have to include Plaintiff in the interviewing process, as the College would have to for all disabled students receiving interpreter services. (#55, 11:5-9.) Plaintiff demands a certified full-time interpreter, but "certification is not required in order for an interpreter to be considered to have the skills necessary to facilitate communication." (#55, 9:1-2.) Indeed, the ADA requires only a "qualified interpreter" as an auxiliary aid for effective communication. Defendant claims that "qualified" does not necessarily demand that the student like

16

the interpreter, only that the interpreter communicate "effectively, accurately, and impartially." (#55 9:3-4, 12.) To require the College to include Plaintiff in assigning interpreters, claims Defendant, would be an undue administrative burden.

As for Spring 2005, Defendant argues that it was unable to assign a new interpreter to Plaintiff's two uncovered classes, and to require it to do so would also be an undue administrative burden. (#55, 8:17-18.) Defendant claims that despite the efforts of DSPS Director Tracey Thomas, who contacted multiple schools and agencies, no interpreters were available. (Joint Stipulated Facts 47-51.) Plaintiff declined alternate auxiliary aids such as transcription and captioning because she claimed they could not provide the necessary level of communication skills required. Thomas also looked at VRI, which turned out to require significant equipment installations and upgrades and was not feasible as a solution for Spring 2005. (Joint Stipulated Facts 52.) Thus, the only way to assign an interpreter for Plaintiff would be to reassign an interpreter from another student's class to Plaintiff's. (#55, 18:10.) Such a reassignment, Defendant states, is also an undue administrative burden.

Defendant argues that Plaintiff's request to choose her own interpreter and include Plaintiff in the process of assigning her an interpreter would constitute an undue administrative burden. Defendant cites two Ninth Circuit cases to support this contention, Zukla v. The Regents of the University of California, 166 F.3d 1041 (9th Cir. 1999) and Memmer v. Marin County Courts, 169 F.3d 630 (9th Cir. 1999) In Zukla the Court held that:

> Deference is also appropriately accorded an educational institution's determination that a reasonable accommodation is not available. Therefore, we agree with the First Circuit that "a court's duty is to first find the basic facts, giving due deference to the school, and then to evaluate whether those facts add up to a professional, academic judgment that reasonable accommodation is not available." *Wynne II, 932 F.2d at 27-28; see also McGregor, 3 F.3d at 859* (the court must "accord deference to [the school's] decisions not to modify its programs [when] the proposed modifications entail academic decisions").
>
> We recognize that extending deference to education institutions [**22] must not impede our obligation to enforce the ADA and the Rehabilitation Act. Thus, we must be careful not to allow academic decisions to disguise truly discriminatory requirements. <u>The educational institution has a "real obligation . . . to seek suitable means of reasonably accommodating a handicapped person and to submit a factual record indicating that it conscientiously carried out this statutory obligation.</u> *Wynne I, 932 F.2d at 25-26*. Once the educational institution has fulfilled this obligation, however, we will defer to its academic decisions. (Emphasis added)

17

Zukla at 1046.

In Memmer the Court noted that being deaf is required a very special skill:

> Memmer's disability, however, differs from Duffy's in a crucial respect. Duffy was deaf; Memmer is visually impaired. Accommodating a deaf person requires a special skill – the ability to converse in sign language [**11] – not possessed by the ordinary person. Memmer's evidence did not show that accommodating her required more than a helper with the ability to observe, to read, and to communicate verbally with her. These skills are possessed by the average person, and more importantly, were possessed by Calderon, the Spanish-language interpreter offered by MCC.

Memmer at 634.

Given the totality of the circumstances, the facts in this case and viewing the evidence in the light most favorable to Plaintiff. It cannot be held that as a matter of law Plaintiff's requests constitute an undue administrative burden on Defendant. In fact, as to one of those issues, the College allowed Plaintiff to use Christopher Gardner, a person she found, as an interpreter when it suited the College's needs. Unlike other disabilities, interpreting for a deaf student requires not only special skills but the ability to effectively communicate through ASL. This almost by definition requires the input and, at times, the inclusion of the Plaintiff in the process of assigning a qualified interpreter to assist her.

## V. CONCLUSION

For the reasons set forth above, and based on the entire record herein, the parties' cross-motions for summary judgment are DENIED. A case management and trial setting conference is scheduled for January 23, 2007 at 1:00 p.m.

Dated:    January 8, 2007.

NANDOR J. VADAS
United States Magistrate Judge